T.C. Memo. 2021-9

UNITED STATES TAX COURT

WILLIAM BRUCE COSTELLO AND MARITZA LEGARCIE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1350-17.                     Filed January 25, 2021.

P-W engaged in a farming activity from which, for the seven years up to and including the two years in issue, she reported losses. Her serial attempts at raising chickens, growing vegetables, and raising cattle were all unsuccessful. She also engaged in a rental real estate activity from which, for the first year in issue, she reported a loss. R disallowed Ps' deductions for the farming losses on the grounds that P-W had not incurred them in carrying on a trade or business. He disallowed an operating loss deduction for one rental property on the grounds that it was not held for rental because it had been flooded, was in no condition to rent, and had not been advertised for rental. He disallowed the sum of operating loss deductions for other rental properties as a passive loss. In determining the passive loss, R took no account of a substantial gain from the sale of two of P-W's rental properties.

<u>Held</u>: Disallowance of deductions for losses from farming activity sustained because losses were startup expenses for which I.R.C. sec. 195(a) prohibits a current deduction.

**Served 01/25/21**

**[*2]**    <u>Held</u>, <u>further</u>, disallowance of operating loss deduction for first rental property sustained because not held for rental.

<u>Held</u>, <u>further</u>, R erred in determining passive loss; disallowance of loss deduction not sustained.

<u>Held</u>, <u>further</u>, addition to tax for failure to timely file return sustained.

<u>Held</u>, <u>further</u>, accuracy-related penalties sustained.

William Bruce Costello and Maritza Legarcie, pro sese.

<u>Andrea M. Faldermeyer</u>, <u>Jordan S. Musen</u>, and <u>Steven M. Roth</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HALPERN, <u>Judge</u>:  Respondent determined deficiencies of $35,003 and $1,648 in petitioners' 2012 and 2013 Federal income tax, respectively, an addition to tax of $8,747 for 2012 for failing timely to file a return, and accuracy-related penalties of $7,001 and $330 for both years, respectively.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and

**[\*3]** Procedure, unless otherwise indicated.  We round all dollar amounts to the nearest dollar.

After a concession,[1] the issues for decision are whether:  (1) petitioners may deduct as business expenses amounts expended in connection with various agricultural pursuits during the years in issue; (2) respondent erred in disallowing petitioners' real estate loss deductions; (3) petitioners are liable for the addition to tax for failure to timely file their 2012 return; and (4) petitioners are liable for the accuracy-related penalties.

Petitioners bear the burden of proof.[2]  See Rule 142(a).

### FINDINGS OF FACT

The parties have stipulated certain facts and the authenticity of certain documents.  The facts stipulated are so found, and documents stipulated are accepted as authentic.  Petitioners resided in California when they filed the petition.

---

[1]Petitioners concede respondent's adjustment for 2012 disallowing their $503,954 deduction for a net operating loss carryover.

[2]Petitioners have not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations.  We conclude that sec. 7491(a) does not apply here because petitioners have not produced evidence that they have satisfied the preconditions for its application.

**[*4]** Tax Returns

Petitioners made joint returns of income on Form 1040, U.S. Individual Income Tax Return, for both their 2012 and 2013 taxable (calendar) years. They filed their 2012 return on November 26, 2013. Attached to each Form 1040 were various schedules on which petitioners claimed deductions for net losses from (1) a farming activity and (2) a real estate activity, both activities carried on by petitioner wife (Ms. Legarcie). At issue are those deductions. Although respondent does not dispute that petitioners spent the amounts deducted, he does challenge their right to those deductions.

Farming Activities

Ms. Legarcie has since at least 2007 carried on a farming activity on a 6,500-acre tract of land, Oasis del Eden (property), in Mexico. Beginning with her 2007 Form 1040, Ms. Legarcie has, on Schedule F, Profit or Loss From Farming, reported the activity. First she (reporting singly) and then petitioners (reporting jointly) have reported net losses from the farming activity for every year beginning with 2007.

In 2007, Ms. Legarcie decided to raise chickens on the property to sell for meat. Apparently, that activity did not go well. Petitioner husband (Mr. Costello) could not recall whether, from 2007 through 2011, petitioners sold any of the

[*5] chickens, and the only sale that Ms. Legarcie reported for 2007 through 2011 is $264 received on the resale (at a loss) of livestock in 2011.

Sometime in 2011, Ms. Legarcie switched from raising chickens for meat to raising them for egg production. By 2012, however, she had determined that she would not make money with commercial egg production because of an upward trend in the price of chicken feed. So she switched from commercial egg production to building a flock in order again to sell chickens for meat. In May 2012, she purchased more than 69 birds, distributed among at least 14 breeds. She sold no chickens in 2012 or 2013 but had plans to begin sales in 2014. Her plans were thwarted when, in January 2014, wild dogs destroyed most of the flock. When Ms. Legarcie was raising meat chickens, she occasionally sold or bartered excess eggs that she did not need to grow the flock. Ms. Legarcie's only reported income from selling eggs is $1,068 she reported for 2012.

Between 2007 and 2011, Ms. Legarcie grew watermelons, squash, peppers, apples, bananas, pomegranates, date palms, and asparagus on the property. She claimed the expenses of growing those crops as farming expense deductions, but she reported no revenues from sales. Her lack of revenue was due to the fact that the property is on the edge of the world's largest evaporative salt plant, and, in 1973, a spill from the salt plant created a salt flat on a portion of the property.

**[*6]** Moreover, evaporation from the salt plant blows across the property and poisons the soil. Crops grown on the property are not commercially acceptable.

In 2012, Ms. Legarcie planted a test crop of peppers, which was not successful because insects destroyed the crop. In neither 2012 nor 2013 did Ms. Legarcie market produce from the property. In his testimony, Mr. Costello agreed that the expenses incurred to grow the peppers were "pre-opening, experimental R&D expenses."

In 2012, Ms. Legarcie acquired three cows and three calves. Her plan, according to Mr. Costello, was: "Feed the calves, make them big, sell them, impregnate the mothers * * * repeat." That plan did not work because, as Mr. Costello explained: "[I]t quickly became apparent that we weren't going to make money on cows because when I turned them out onto the * * * 6,500 acres, they couldn't find enough to eat. * * * We immediately got rid of the cows." Ms. Legarcie sold the cows in 2013 for $4,800, which is the only farm activity income reported for 2013.

Mr. Costello explained the impetus behind Ms. Legarcie's progression from activity to activity: "When you have something in a business that is not making money, you change it, and you figure out why it's not making money. You evaluate to see if you could make it make money. If it doesn't, you stop doing that

**[*7]** and you start doing something else. He conceded: "[W]e have tried several things on this property; so far, nothing has worked." He was, however, hopeful that something would come along that would work and be profitable: "Will something come along that will work? When the right opportunity comes, financial conditions change, market conditions change, then yes, I fully expect to be able to make a profit. At the present moment, no, * * * [we] don't."

For 2012 and 2013, Ms. Legarcie reported on Schedules F the gross income and expenses from her farming activities. She described her principal crop or activity on the schedules as "Poultry Products". For 2012, she reported income of $1,068 from egg sales, and, for 2013, income of $4,800 from the sale of the cows. She reported her deductible expenses for each year both on the Schedule F and on the Schedule C, Profit or Loss From Business (Schedule C (farming)). The parties agree that the Schedule C (farming) expenses should have been reported on the Schedules F and that the treatment of the Schedule C (farming) expenses follows that of the Schedule F expenses. The following tables show the particulars of Ms. Legarcie's tax reporting for her farming activity.

[*8]                              Schedule C (Farming)

|  | 2012 | 2013 |
|---|---|---|
| Gross income | -0- | -0- |
| Car and truck expenses | ($2,618) | -0- |
| Depreciation | (852) | -0- |
| Taxes and licenses | (262) | ($262) |
| Total | (3,732) | (262) |

Schedule F

|  | 2012 | 2013 |
|---|---|---|
| Gross income | $1,068 | $4,800 |
| Car and truck expenses | (80) | -0- |
| Feed | (6,636) | (18,461) |
| Gasoline, fuel, and oil | (5,530) | (1,140) |
| Total | (11,178) | (14,801) |

Respondent disallowed petitioners' deductions for Ms. Legarcie's net Schedule C (farming) losses and also disallowed their deductions for her net Schedule F losses of $10,110 and $10,001 for 2012 and 2013, respectively. In his pretrial memorandum, respondent explains that, for each year, he erroneously subtracted Ms. Legarcie's Schedule F gross income from her net Schedule F loss in determining the Schedule F disallowance. He makes no claim for an added deficiency on account of that mistake. Respondent explains that he made his

[*9] adjustments, disallowing Ms. Legarcie's farming losses because she did not incur those losses carrying on a trade or business.

Real Estate Activity

Petitioners attached Schedule E, Supplemental Income and Loss, to each of their 2012 and 2013 Forms 1040 reporting income and losses from rental real estate. On those Schedules E, petitioners reported that they were real estate professionals who materially participated in a rental real estate activity. On the 2012 Schedule E, they listed four separate properties, and, on the 2013 Schedule E, they listed two of those four properties. The following table shows the properties listed and the Schedule E income or loss from each.

| Property | 2012 | 2013 |
|---|---|---|
| Sproule Ave., Pacoima, CA | $1,260 | -0- |
| Truman St., San Fernando, CA | 26,110 | $50,540 |
| San Fernando Rd., San Fernando, CA | (39,240) | -0- |
| Silvertip Dr., Big Bear Lake, CA | (8,825) | (9,094) |
| Total | (20,695) | 41,446 |

The Silvertip Dr. property was flooded sometime in the 2000s and was not thereafter in condition to rent. Petitioners did not advertise it for rental and reported no rental income for it after 2005.

[*10] Petitioners sold both the San Fernando Rd. and the Sproule Ave. properties in 2012 and reported from those sales a long-term capital gain of $312,747.

Petitioners also claimed on Schedules C (Schedules C (real estate)) for both 2012 and 2013 deductions for expenses related to the real estate activity reported on their 2012 and 2013 Schedules E. They claimed on those Schedules C (real estate) deductions of $14,617 and $25,308 for 2012 and 2013, respectively. Petitioners claimed those deductions on the Schedules C (real estate) rather than apportion them between the properties listed on their Schedules E because, Mr. Costello testified, he did not separately track the expenses for each property.

Respondent disallowed petitioners' deductions for the claimed losses on the Silvertip Dr. property for both 2012 and 2013 on the grounds that it was not a rental property. He disallowed petitioners' remaining 2012 Schedule E loss of $11,871 ($11,871 = $20,696 − 8,825) on the grounds that it was a passive activity loss. He determined that the disallowed passive activity loss could be carried over and claimed against passive activity income in 2013. That reduced petitioners' 2013 rental income (disregarding the disallowed Silvertip Dr. loss) to $38,669 ($38,669 = $50,540 − 11,871), which was $2,777 less than the amount reported on petitioners' 2013 Schedule E. Respondent made an appropriate adjustment to petitioners' 2013 taxable income. Respondent disallowed the $14,617 and

[*11] $25,308 Schedule C (real estate) losses for 2012 and 2013, respectively, on the grounds that Ms. Legarcie was not in a real estate trade or business. He now concedes, however, that the Schedule C (real estate) losses were related to petitioners' Schedule E activity.

Penalties

Respondent determined that petitioners are liable for an addition to tax for failure to file a timely tax return for 2012 and accuracy-related penalties based on negligence and a substantial understatement of income tax for 2012 and on negligence for 2013. The record includes a Civil Penalty Approval Form, dated May 4, 2016, and signed by the immediate supervisor of the revenue agent who conducted the examination in this case, approving the addition to tax and the penalties before the date the notice of deficiency was issued.

OPINION

I.    Farming Activities

Respondent disallowed Ms. Legarcie's farming-activity losses on the grounds that she had not incurred the losses in carrying on a trade or business. Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Respondent argues that Ms. Legarcie cannot deduct her farming-activity losses

[*12] under section 162 for two reasons; one, she lacked a profit motive, and, two, her business had not during 2012 and 2013 yet commenced. "[Her] farm activity never moved beyond initial research and investigation into an operating business." While it is true that section 183(a) as a general rule disallows any deduction attributable to an activity not engaged in for profit and that the regulations implementing section 183 lay out nine nonexclusive factors for determining whether an activity is engaged in for profit, some of which favor Ms. Legarcie[3] and some of which do not,[4] Mr. Costello has convinced us that, notwithstanding seven fallow years, his wife was determinedly seeking during the years in issue to earn a profit from farming. Nevertheless, we do agree with respondent that, during 2012 and 2013, her activities were for the most part preoperational and, for that reason, she may not deduct her losses.

In order for expenses to be deductible under section 162(a), the expenses must relate to a trade or business functioning when the expenses were incurred.

---

[3]See, e.g., sec. 1.183-2(b)(1), Income Tax Regs. ("A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may * * * indicate a profit motive.").

[4]See, e.g., sec. 1.183-2(b)(7), Income Tax Regs. ("An occasional small profit from an activity generating large losses * * * would not generally be determinative that the activity is engaged in for profit.").

**[\*13]** Hardy v. Commissioner, 93 T.C. 684, 687 (1989). A taxpayer has not "'engaged in carrying on any trade or business' within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized." Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965). "Carrying on a trade or business" requires a showing of more than initial research into or investigation of business potential. Sec. 162(a); Dean v. Commissioner, 56 T.C. 895, 902 (1971). "The business operations must have actually commenced." McKelvey v. Commissioner, T.C. Memo. 2002-63, 2002 WL 341044, at \*3, aff'd, 76 F. App'x 806 (9th Cir. 2003). "Until the time the business is 'performing the activities for which it was organized,' expenses related to that activity are not currently deductible under section 162." Heinbockel v. Commissioner, T.C. Memo. 2013-125, at \*42 (quoting Glotov v. Commissioner, T.C. Memo. 2007-147, 2007 WL 1702618, at \*2). They are instead classified as "startup" or "pre-opening" expenses. Hardy v. Commissioner, 93 T.C. at 687. And startup expenses--which include those incurred "before the day on which the active trade or business begins"--are only deductible over time once an active trade or business begins. See sec. 195(a), (c)(1)(A)(iii).

**[\*14]** Section 195(a) provides that no deduction shall be allowed for startup expenditures. Section 195(c)(1) defines startup expenditures as, among other things, any amount paid in connection with creating an active trade or business, which, if paid or incurred in connection with the operation of an existing active trade or business, would be allowable as a deduction for the taxable year in which paid or incurred. Section 195(b) provides that startup expenditures may, at the election of the taxpayer, be treated as deferred expenses that are allowed as a deduction prorated equally over a 15-year period beginning with the month in which the active trade or business begins. Startup expenses incurred in an unsuccessful attempt to create a business may be deductible if the attempt is far enough along. See, e.g., Seed v. Commissioner, 52 T.C. 880 (1969) (finding deductible loss under section 165(c)(2) for legal and other expenses on abandonment of business venture following denial of application for charter); Rev. Rul. 77-254, 1977-2 C.B. 63.

McKelvey is instructive here. The taxpayer there purchased 39 acres with a barn, and a cabin that he used as his personal residence. McKelvey v. Commissioner, 2002 WL 341044, at \*1. He intended to start a tree-farming business on the property. Id. In the second year during which he owned the property (the first year in issue), he began by conducting a "pilot test", planting of

[*15] 51 Coulter pine trees, to determine whether the land could support commercial Coulter pines. The test quickly proved unsuccessful because the land could not support the trees. Id. at *2. By the end of the third year during which he owned the property (and the second year in issue), he had not decided what species of trees to plant and had not harvested any of the existing trees on the property. Id. Indeed, as of the eighth year during which he owned the property, he had not harvested any trees, had not planted any new trees, and had not yet decided which species of trees to plant. Id. We agreed with the Commissioner that what all that meant was that the taxpayer during the two years in issue did not have a functioning business. Id. at *3. His expenses were therefore startup expenses for which on account of section 195(a) we allowed no current deduction. Id. at *3-*4.

Reems v. Commissioner, T.C. Memo. 1994-253, 1994 Tax Ct. Memo LEXIS 256, is similar. The taxpayer there also purchased property on which to raise and harvest timber and had taken the first steps in a program to start a commercial timbering business, paying some $30,000 in expenses. Reems v. Commissioner, 1994 Tax Ct. Memo LEXIS 256, at *7-*8. Notwithstanding some incidental sales of firewood and walnut trees from the property, we found that, during the year in issue, he had not commenced an active business on the property.

**[*16]** Id. at *12.  We allowed no deduction for what we described as "'start-up expenditures'[,] * * * clearly covered by section 195".  Id. at *11; see also Heinbockel v. Commissioner, T.C. Memo. 2013-125.

Beginning in 2007 and through the years in issue, Ms. Legarcie's farming activities never moved beyond initial experimentation and investigation into an operating business.  In 2012 and 2013, she was still planting research crops. With respect to the peppers planted in 2012, Mr. Costello agreed that the expenses of growing the peppers were "pre-opening, experimental, R&D expenses." Ms. Legarcie described her principal crop or activity on the 2012 and 2013 Schedules F as "Poultry Products", a description we assume included both poultry meat and egg production.  But, in fact, she never sold any chickens for meat, even though she raised a flock of meat chickens between 2007 and 2011.  She sold and bartered eggs from 2007 through 2013, but, from 2007 to 2011, those eggs were byproducts from raising meat chickens.  She briefly concentrated on commercial egg production in 2011; but by the beginning of 2012, she had determined to stop because it would not make money.  She then went back to meat production, which she continued unsuccessfully until January 2014, which is after the years in issue. Mr. Costello summed his wife's farming activities when he testified:  "[W]e have tried several things on this property; so far, nothing has worked."

**[\*17]** There is some question of whether to treat all of Ms. Legarcie's farming activities as one activity or treat poultry, cattle, and crops as separate activities for determining whether she had commenced an active trade or business. It may not make much difference. She has not segregated her costs by activity. We agree that, like the tree farmers in McKelvey and Reems, Ms. Legarcie had not, as of 2012, commenced any active business on the property. The egg-sale money that she reported for 2012 was an incidental receipt realized after she had determined to abandon commercial egg production and switch again, to meat production, which she carried on though 2013. She may have ended her cattle activity in 2013, but we have no itemization of the costs of that activity or any basis to estimate any deductible loss. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). Most of her Schedules C (farming) and F expenses are startup expenses for which section 195(a) prohibits a current deduction.[5] To that extent,

---

[5]On the Schedules C (farming), she claimed a deduction for some amount of taxes paid. If sec. 164 allows a deduction for those payments, those taxes paid are not startup expenditures. See sec. 195(c)(1)(B). If necessary, the parties can address that in their Rule 155 computation.

**[\*18]** we sustain respondent's adjustments disallowing petitioners' Schedule C (farming) and F losses.[6]

## II. Real Estate Activities

Petitioners have failed to convince us that the Silvertip Dr. property, which had been flooded, was in no condition to rent, and had not been advertised for rental, was, during 2012 or 2013, a rental property. Indeed, petitioners make no argument that under either section 162 (Trade or Business Expenses), section 212 (Expenses for Production of Income), or any other section of the Internal Revenue Code are they entitled to any deduction with respect to the Silvertip Dr. property for either year. We will sustain respondent's adjustment disallowing petitioners claimed loss deductions of $8,825 and $9,094 with respect to the property for 2012 and 2013, respectively.

With respect to the remaining 2012 Schedule E loss of $11,871 and the 2012 Schedule C (real estate) loss of $14,617 (whose treatment follows the treatment of the Schedule E loss), respondent now concedes that he erred in determining that for 2012 there was any passive activity loss. In a posttrial conference with the parties, the Court pointed out that, in 2012, petitioners sold

---

[6]Also, respondent has disallowed Ms. Legarcie's farm-activity losses only to the extent they exceed her farm-activity income. Sec. 195 does not appear so restricted. We will not go beyond respondent's adjustments.

[*19] both the 1663 San Fernando Rd. and the 11727 Sproule Ave. properties and reported from those sales a 2012 long-term capital gain of $312,747. Respondent concedes that the amount of gain was part of petitioners' "aggregate income from * * * passive activities" for 2012. See sec. 469(d)(1)(B); sec. 1.469-2T(c)(2), Income Tax Regs., 53 Fed. Reg. 5711 (Feb. 25, 1988). Moreover, because the 2012 aggregate income from passive activities greatly exceeded the year's aggregate losses from passive activities (including the Schedule C (real estate) loss), there was no 2012 passive activity loss. See sec. 469(d)(1). And, for that reason, there was no passive activity loss that could be carried over to 2013.[7]

In sum, except for respondent's Schedule E adjustment disallowing any loss deduction with respect to the Silvertip Dr. property, his Schedule E and Schedule C adjustments for both 2012 and 2013 were in error and must be reversed. That will necessitate a Rule 155 computation.

III.    Addition to Tax and Penalties

A.    Introduction

Section 7491(c) imposes the burden of production in any court proceeding on the Commissioner with respect to the liability of any individual for penalties

---

[7]And petitioners make no argument for any passive loss carryover from 2011 to 2012.

[*20] and additions to tax. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). In order to meet the burden of production under section 7491(c), the Commissioner need only make a prima facie case that imposition of the penalty or addition to tax is appropriate. E.g., Ball v. Commissioner, T.C. Memo. 2020-152, at *12. If the Commissioner carries his burden, the taxpayer has the burden of proving that any affirmative defenses apply, such as reasonable cause. Higbee v. Commissioner, 116 T.C. at 446-447; Ball v. Commissioner, at *12.

B.      Addition to Tax for Failure To File Return Timely

Section 6651(a)(1) imposes an addition to tax for failure to file a timely tax return. The addition equals 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. Id. The addition to tax does not apply if the failure to file timely is due to reasonable cause and not to willful neglect. Id.

Petitioners filed their 2012 tax return on November 26, 2013, several months after it was due. See sec. 6072(a). Respondent has, therefore, satisfied his burden of production. Petitioners make no argument that their failure to file the return timely was due to reasonable cause and not willful neglect. Thus, we will sustain the section 6651(a)(1) addition to tax for 2012.

**[\*21]** C.    <u>Section 6662 Accuracy-Related Penalties</u>

Section 6662(a) and (b)(1) and (2) provides for an accuracy-related penalty of 20% of the portion of any underpayment attributable to, among other things, negligence or disregard of rules or regulations (without distinction, negligence) or any substantial understatement of income tax. The term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code or a failure to exercise "ordinary and reasonable care in the preparation of a tax return." <u>See</u> sec. 1.6662-3(b)(1), Income Tax Regs. Section 6662(d)(2)(A) generally defines the term "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed. In the case of an individual, an understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority" or, in the case of items adequately disclosed, a "reasonable basis". Sec. 6662(d)(2)(B). Section 6664(c)(1) provides an exception to the imposition of the section 6662(a) accuracy-related penalty if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith.

[*22] Because we do not sustain all of respondent's adjustments to petitioners' income for 2012, we cannot determine whether petitioners substantially understated their 2012 income tax. We need not do so because respondent has satisfied his burden of production with respect to petitioners' negligence for 2012 and 2013. Petitioners conceded that they improperly claimed the NOL carryover deduction on their joint 2012 tax return. They also erroneously claimed deductions for Schedules C (farming) and F losses for Ms. Legarcie's farming activity to which they are not entitled. Respondent has produced a Civil Penalty Approval Form meeting the requirements of section 6751(b). Respondent has met his burden of production.

Petitioners did not address the section 6662(a) penalties either at trial or in their brief, and the evidence before us fails to demonstrate that they acted with reasonable cause or in good faith. We sustain the accuracy-related penalties determined by respondent.

IV. Conclusion

To reflect the foregoing and concessions by the parties,

Decision will be entered under

Rule 155.